# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| VINCENT GUZZO, Derivatively on Behalf of UNITI GROUP, INC.,<br>207 Kensington Road<br>Lynbrook, NY  11563;<br><br>        Plaintiff,<br><br>   v.<br><br>KENNETH A. GUNDERMAN,<br>2405 York Road, Suite 201,<br>Lutherville-Timonium, MD 21093;<br><br>MARK A. WALLACE,<br>19381 Surfrider Ln.<br>Huntington Beach, CA 92648-2132;<br><br>FRANCIS X. FRANTZ,<br>2405 York Road, Suite 201,<br>Lutherville-Timonium, MD 21093;<br><br>DAVID L. SOLOMON,<br>2405 York Road, Suite 201,<br>Lutherville-Timonium, MD 21093;<br><br>JENNIFER S. BANNER,<br>2405 York Road, Suite 201,<br>Lutherville-Timonium, MD 21093;<br><br>SCOTT G. BRUCE<br>2405 York Road, Suite 201<br>Lutherville-Timonium, MD 21093;<br><br>        Defendants,<br><br>   -and-<br><br>UNITI GROUP, INC., a Maryland Corporation,<br>2405 York Road, Suite 201<br>Lutherville-Timonium, MD 21093-2264 | Civil Action No.:<br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**SERVE ON**:

Resident Agent
CSC-Lawyers Incorporating Service Company
7 St. Paul Street, Suite 820
Baltimore, MD 21202,

Nominal Defendant.

Plaintiff Vincent Guzzo ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint, derivatively for the benefit of Nominal Defendant Uniti Group, Inc. ("Uniti" or the "Company"). Plaintiff bases his allegations on personal knowledge and, as to all other matters outside his personal knowledge, upon information and belief based on the investigation of counsel, which includes without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of filings in federal court, including pleadings in the related securities fraud class action, *In re Uniti Group, Inc., Secs. Litig.*, No. 4:19-cv-00756-BSM (E.D. Ark.) (filed Oct. 25, 2019) (the "Securities Class Action"), as well as pleadings in *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc., et al.*, C.A. No. 1:19-cv-01813 (D. Del.) (the "SLF Action"); and (iii) review and analysis of press releases, news reports, analyst reports, industry reports, investor conference call transcripts, and other information available in the public domain.

I.      **INTRODUCTION**

1.      This is a stockholder derivative action brought on behalf of and for the benefit of Uniti, against certain of its current and former officers and directors, seeking to remedy their breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and contribution. Defendants' (defined below) actions have caused substantial financial and reputational harm to Uniti.

2.      Uniti, formerly known as Communications Sales & Leasing, Inc. ("CS&L") is engaged in the business of acquiring and constructing infrastructure in the communications industry.

3.      When Uniti, which was previously incorporated as a wholly owned subsidiary of Windstream Holdings, Inc. ("Windstream"), went through a "Spin-Off" in April 2015, Windstream sold telecommunications network assets to Uniti in exchange for Uniti issuing common stock, indebtedness, and cash obtained from borrowings under Uniti's senior credit facilities.

4.      According to Uniti, in connection with the Uniti Spin-Off, Windstream sold to Uniti certain telecommunications network assets, including fiber and copper networks, other real estate, and a small consumer competitive local exchange carrier.  Uniti then leased these assets back to Windstream via a "Master Lease" agreement.  A substantial portion of Uniti's leasing revenue is derived from the Master Lease.

5.      While the Master Lease was between Uniti and Windstream, the Windstream operating subsidiaries were the direct beneficiaries of the lease and in effect were the *de facto* lessees of the fiber and copper network assets.  Windstream is Uniti's largest customer, accounting for more than two-thirds of Uniti's annual revenues for every year since the Uniti Spin-Off.

6.      In January 2013, Windstream issued senior unsecured notes guaranteed by certain of its subsidiaries in an aggregate principal amount of $700 million.  Unbeknownst to the investing public, the indenture governing the sale of the notes (the "Indenture") included a number of restrictive covenants, one of which prohibited the operating subsidiaries from engaging in "Sale and Leaseback Transaction[s]," absent certain exceptions.  These restrictive covenants prohibited

Windstream's operating subsidiaries from selling Windstream's fiber and copper network assets to a third party and then leasing those assets back.

7.     A violation of the restrictive covenants would have severe financial consequences for Uniti and its operating results, liquidity, and ability to access credit and satisfy existing debt obligations – which could bankrupt Windstream.

8.     While Windstream was telling regulators that the Windstream operating subsidiaries were the true beneficiaries of the leaseback plan, and the lease was simply being entered into at the corporate level for administrative benefits, the Windstream insiders, who were either to become Uniti insiders, worked closely on this with Uniti insiders, or were closely related to a Uniti insider, knew that this was a direct violation of the Indenture.

9.     On March 25, 2015, the Windstream board approved the Uniti Spin-Off. Windstream had effectively done an end-run around the restrictive covenants in the Indenture and gave shareholders the impression that they were not violating these restrictions.  Windstream Corporation (now known as Windstream Services, LLC), borrowed millions of dollars with the specific condition that they would not sell and leaseback assets, and then set up an arrangement whereby their operating subsidiaries would sell their assets to Uniti, which would then lease them back to Windstream for the exclusive use by the subsidiaries.  Then, Windstream, upon receiving rent payments from the subsidiaries, would pay Uniti under the Master Lease.

10.     Beginning on April 20, 2015, when Uniti common stock began trading on NASDAQ, and continuing through the present, Defendants caused or otherwise allowed the Company to mislead investors and the market by publicly misstating or failing to disclose, among other things: (i) the Company borrowed millions of dollars with the specific condition that they would not sell and leaseback assets; (ii) obtained regulatory approval by asserting that operating

beneficiaries were the true beneficiaries of the Master Lease and promoting the transaction without mention of the restrictive covenants; and (iii) attempting to avoid the Indentures restrictive covenants which exposed the company to a material risk that the transaction could be successfully challenged by Company noteholders in court, as it ultimately was.

11.     On September 21, 2017, Aurelius Capital Master, Ltd. ("Aurelius"), the beneficial owner of more than 25% of Windstream's outstanding notes under the Indenture, provided written notice to Windstream that the Uniti Spin-Off and sale-leaseback transaction was a violation of the Indenture's restrictive covenants.

12.     When Windstream acknowledged in a Form 8-K it filed with the SEC that it had received the notice of default, it denied that that any prohibited sale-leaseback transaction occurred and downplayed the issue, but the market was unconvinced and on September 26, 2017, the first full day of trading following the 8-K, Uniti stock dropped nearly 10% by closing.

13.     On October 12, 2017, U.S. Bank (the "Trustee"), filed the Indenture Litigation, captioned *U.S. Bank N.A. v. Windstream Servs., LLC*, No. 17-cv-07857-JMF (S.D.N.Y. Oct. 12, 2017), alleging that the Uniti Spin-Off and sale-leaseback transaction violated the Indenture.

14.     That same day, Uniti held an earnings conference call with analysts and investors to discuss the Company's earnings and operations.  During the earnings conference call, Defendant Kenneth A. Gunderman ("Gunderman") stated that they would not respond to questions regarding Windstream's current litigation but "remind[ed]" everyone that Windstream had "very competent counsel and advisors involved in the initial spin-off."

15.     On November 7, 2017, at the Wells Fargo Media & Telecom Conference, Gunderman stopped the stock price bleeding by taking umbrage with the mere questioning about

the validity of the sale-leaseback transaction and reiterated his confidence in the lease payments, stating:

> We find it extremely frustrating, especially on behalf of our shareholders that there's so much turmoil going on, and especially when we think the claim itself is just manufactured. We've been following it very, very closely. We've contingency planned for all conceivable outcomes. We've done a deeper dive on our lease and our different scenarios than we ever have before and continue to be highly confident in the leased, lease payment, the protections that we have in all scenarios. So none of that has changed. And it's really the same thing we've been saying from Day 1, even before we were spun out. So none of that has changed. And we do think that the trends and the tide are moving in Windstream's favor in terms of the things that they're dealing with. And there's going to be a lot more clarity on all of this over the coming weeks. But in the meantime, we're staying focused on our business. We're staying focused on growing. And to your question, there have been no conversations with Windstream about renegotiating the lease, not in the past and not right now.

16.     On February 15, 2019, United States District Court Judge Jesse M. Furman released his finding that the Uniti Spin-Off and the sale-leaseback transaction breached the Indenture. Judge Furman's decision was based on a number of factors, including the fact that the subsidiaries had exclusive use of the leased property and the fact that the subsidiaries subleased the property to others which they wouldn't be able to do without a leasehold interest in the property.  The court concluded that it "walks like a lease and talks like a lease . . . because it is a lease."  Accordingly, the Trustees and Aurelius were entitled to a judgment against Windstream and awarded Aurelius a money judgment of over $300 million.

17.     In response, the price of Uniti stock spiraled down 53% in the following days of trading.

18.     On February 25, 2019, Windstream announced it had filed for Chapter 11 bankruptcy as a result of Judge Furman's decision in the Indenture Litigation.

19.     On March 18, 2019, Uniti filed its Form 10-K for Fiscal Year 2018 where it stated that its auditors, PricewaterhouseCoopers LLP, have "substantial doubt as to whether [Uniti] could

continue as a going concern within one year after the date the financial statements are issued as a result of Windstream's bankruptcy petition and [its] potential uncertain effects on the Master Lease."  They added that they included the going concern opinion letter in their 2018 audited financial statement because not doing so would be a breach of the covenants of their Credit Agreement, but also stated that they "expect Windstream will continue to perform on the Master Lease and believe it is unlikely that Windstream will reject the Master Lease because the Master Lease is central to Windstream's operations.

20.     Uniti further repeatedly asserted that "management has concluded the probability of a rejection of the Master Lease to be remote" and provided financial statements that did not include any adjustment that might be necessary if the Company was unable to continue as a going concern, failing to disclose that Uniti was running out of sufficient liquidity and would soon need to issue additional debt if it was to continue operations.

21.     Despite Uniti's repeated assertions that they did not have any liquidity concerns, on June 24, 2019, Uniti announced a note offering of $300 million aggregate principal amount of exchangeable senior notes due 2024 (the "Exchangeable Notes"), with an option to purchase up to an additional $45 million aggregate principal amount of the Exchangeable Notes during a 13-day period beginning on, and including, the first day on which the Exchangeable Notes are issued.

22.     As a result, the price of Uniti stock dropped another 12%, from $10.69 when the market closed on June 24, 2019, to $9.38 when the market closed on June 25, 2019, on very heavy volume.

23.     The market for Uniti common stock was open, well-developed, and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Uniti common stock traded at artificially inflated prices during the time in question.

24.     During this period, the Individual Defendants caused the Company to disseminate materially false or misleading information the investing public, thereby inflating the price of Uniti common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make their statements not false and misleading.  These statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company and its business and operations.

25.     As a direct result of the Individual Defendants' unlawful course of conduct, the Company misled the investing public about its business, operations, and prospects.  Consequently, Uniti is now the subject of the Securities Class Action.  The Securities Class Action asserts claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") in connection with these improper public statements which artificially inflated the price of Uniti's common stock.

26.     On March 31, 2021, Judge Brian S. Miler denied Uniti's motion to dismiss in the Securities Class Action (the "Order").

27.     The Order found that plaintiffs not only successfully pleaded misrepresentation and false statement liability in failing to disclose the prohibited structure of the Spin-Off and Lease, but plaintiffs had also successfully pleaded that the defendants knew or should have known that the Lease violated the Indenture because of their intimate involvement in conceiving and negotiating the Spin-Off and Lease.  Ultimately, the known risks that defendants concealed materialized.

28.     The Defendants named in this Complaint face liability to the Company for their misconduct, including, among other things: (a) failing to maintain an adequate system of oversight,

accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf; (b) failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws; (c) directly participating in the improper schemes and misconduct described herein; and (d) affirmatively making, allowing to be made, and/or failing to correct improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, the violation of the Indenture's restrictive covenants, as well as the Company's overall business, operations, and future prospects.

29.     Due to the Uniti's Board of Directors' (the "Board") refusal to consider Plaintiff's Demand (defined herein), form an investigation, or retain independent counsel for over a year is a *de facto* wrongful refusal.  Accordingly, Plaintiff brings this action to remedy the harm to Uniti caused by Defendants' faithless actions.

## II.     JURISDICTION AND VENUE

30.     Pursuant to 28 U.S.C. § 1331 and section 27 of the Exchange Act (15 U.S.C. § 78aa), this Court has jurisdiction over the contribution claims asserted herein under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

31.     This Court also has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

32.     This Court has personal jurisdiction over each defendant because each defendant is either a corporation conducting business and maintaining operations in this district or an individual

who is either present in this district for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

33.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) because: (i) Uniti is a business incorporated in this district; (ii) one or more of the Defendants resides or maintains offices in this district; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this district; (iv) Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district; and (v) Uniti has expressly consented to jurisdiction in this district.

## III.    PARTIES

### A.    Plaintiff

34.     Plaintiff is a current stockholder of Uniti and has continuously owned such shares since October 16, 2008.  Plaintiff is a citizen of New York.

35.     Plaintiff will hold Uniti shares continuously throughout the pendency of this action. Plaintiff brings this action derivatively in the right of and for the benefit of the Company.  Plaintiff will fairly and adequately represent the interests of Uniti and its stockholders in enforcing the rights of the Company.

### B.    Nominal Defendant

36.     Nominal Defendant Uniti, formerly known as CS&L, is a real estate investment trust ("REIT") engaged in the acquisition and construction of mission critical infrastructure in the

communications industry.  Uniti is a Maryland corporation with its principal executive offices located at 10802 Executive Center Drive, Benton Building, Suite 300, Little Rock, Arkansas 72211.

37.    The Company's common stock trades on the New York Stock Exchange (NYSE) under the ticker symbol "UNIT."   Uniti has over 233.45 million shares of common stock outstanding.

### C.    Individual Defendants

38.    Defendant Gunderman has been Uniti's President and CEO and a director since March 2015.  Gunderman received total compensation of $6,370,863.00 from the Company in 2015; total compensation of $5,126,583.00 from the Company in 2016; total compensation of $5,425,302.00 from the Company in 2017; total compensation of $5,145,598.00 from the Company in 2018; total compensation of $6,017,279.00 from the Company in 2019; and total compensation of $6,787,463.00 from the Company in 2020; adding up to $34,873,088.00 in total compensation overall.  Gunderman is named as a defendant in the Securities Class Action.  Upon information and belief, Gunderman is a citizen of the State of Arkansas.

39.    Defendant Mark A. Wallace ("Wallace") is Uniti's current Executive Vice President ("EVP"), CFO, and Treasurer since April 2015.  Wallace received total compensation of $1,566,398.00 from the Company in 2015; total compensation of $1,617,469.00 from the Company in 2016; total compensation of $2,012,408.00 from the Company in 2017; total compensation of $1,924,166.00 from the Company in 2018; total compensation of $2,127,277.00 from the Company in 2019; and total compensation of $3,273,576.00 from the Company in 2020; adding up to $12,521,294.00.  Wallace is named as a defendant in the Securities Class Action. Upon information and belief, Wallace is a citizen of the State of California.

40.     Defendant Francis X. Frantz ("Frantz") has been the Chairman of the Board since 2015.  Frantz also served as a director of Windstream, a telecommunications company, from 2006 until Uniti spun-off from Windstream in April 2015, including as Chairman of Windstream's Board from July 2006 to February 2010, and as Chairman of Windstream's Audit Committee at the time of the Uniti Spin-Off.  From 2015 until the present (the "Relevant Period"), Frantz received a total of $2,067,424.60 in compensation from the Company.  Upon information and belief, Frantz is a citizen of the State of Florida.

41.     Defendant David L. Solomon ("Solomon") has been a director since June 1, 2015. During the Relevant Period, Solomon received a total of $1,315,483.06 in compensation from the Company.  Upon information and belief, defendant Solomon is a citizen of Tennessee.

42.     Defendant Jennifer S. Banner ("Banner") has been a director since June 1, 2015. During the Relevant Period, Banner received a total of $1,402,509.64 in compensation from the Company.  Upon information and belief, Banner is a citizen of the State of Tennessee.

43.     Defendant Scott G. Bruce ("Bruce") has been a director since June 29, 2016. During the Relevant Period, Bruce received a total of $1,027,045.00 in compensation from the Company.  Upon information and belief, Bruce is a citizen of the State of Pennsylvania.

44.     Defendants Gunderman and Wallace are collectively referred to as the "Officer Defendants."   Defendants Gunderman, Frantz, Solomon, Banner, and Bruce are collectively referred to as the "Director Defendants."   Together, the Officer Defendants and the Director Defendants are collectively referred to as the "Individual Defendants."

## IV.    DEFENDANTS' MISCONDUCT

### A.    Company Background

45.    Uniti, formerly known as CS&L, is a REIT engaged in the acquisition and construction of mission critical infrastructure in the communications industry.

46.    In September 2014, the Company was incorporated as a wholly owned subsidiary of Windstream.

47.    Uniti principally focuses on acquiring and constructing fiber optic broadband networks, wireless communication towers, copper and coaxial broadband networks, and data centers.  Operations are managed in four separate lines of business: Uniti Fiber, Uniti Towers, Uniti Leasing, and Talk America Services, LLC.

48.    In the April 2015 Uniti Spin-Off, Windstream sold telecommunications network assets to Uniti in exchange for Uniti issuing common stock, indebtedness, and cash obtained from borrowings under Uniti's senior credit facilities.

49.    In connection with the Uniti Spin-Off, Gunderman was Windstream's financial advisor while working at Stephens Inc., a privately held investment banking/financial services firm and Robert Gunderman, his brother, was Windstream's Treasurer and CFO.

50.    According to Uniti, in connection with the Uniti Spin-Off, Windstream sold to Uniti certain of its telecommunications network assets, including fiber and copper networks, other real estate, and a small consumer competitive local exchange carrier.  Uniti then leased these assets back to Windstream via a "Master Lease" agreement.  A substantial portion of Uniti's leasing revenues are derived from the Master Lease.

51.    While the Master Lease was between Uniti and Windstream, the Windstream operating subsidiaries were the direct beneficiaries of the lease and in effect were the *de facto*

lessees of the fiber and copper network assets. Windstream is Uniti's largest customer, accounting for more than two-thirds of Uniti's annual revenues for every year since the Uniti Spin-Off.

    **B.**    **The Uniti Spin-Off/Leaseback Violated Restrictive Covenants in Windstream's Note Indenture**

52.    In January 2013, Windstream issued senior unsecured notes guaranteed by certain of its subsidiaries in an aggregate principal amount of $700 million. Unbeknownst to the investing public, the indenture governing the sale of the notes included several restrictive covenants, one of which prohibited the operating subsidiaries from engaging in "Sale and Leaseback Transaction[s]," absent certain exceptions. These restrictive covenants prohibited Windstream's operating subsidiaries from selling Windstream's fiber and copper network assets to a third party and then leasing those assets back.

53.    A violation by Windstream of the restrictive covenants governing its notes could lead to the noteholders taking action to accelerate the notes, obligating Windstream to immediately repay hundreds of millions of dollars, which could bankrupt Windstream.

54.    Moreover, Windstream's violation of the restrictive covenants would have severe financial consequences for Uniti and its operating results, liquidity, and ability to access credit and satisfy existing debt obligations.

55.    Prior to the time in question, Gunderman, along with other Windstream executives, told regulators during the regulatory approval process that the Windstream operating subsidiaries would have "the exclusive right to use, access, and operate the assets" through the sale-leaseback arrangement.

56.    However, at the same time, Windstream's general counsel, John Fletcher ("Fletcher"), was assuring potential investors that Windstream would be the lessee of the assets

and omitted any disclosure to investors that the Windstream operating subsidiaries would actually be the parties using, accessing, and operating the assets.

57.     Throughout 2014, Fletcher acted as general counsel for both Windstream and Uniti and worked to convince several state utility regulatory bodies that they should approve Windstream's sale and leaseback arrangement. His rationale for approval was that the Windstream operating subsidiaries would be leasing the assets back and retaining exclusive, long-term access to and control of them. Fletcher drafted, and signed on behalf of Uniti and Windstream, the application to the Alabama Public Service Commission ("PSC"), which was filed in Montgomery, Alabama on July 31, 2014. In the application, Fletcher requested authorization to transfer certain fixed assets of the "WIN Companies" (that are made up of the operating subsidiaries) to CS&L, and CS&L would lease them back to Windstream on a long-term basis for the exclusive use and benefit of the WIN Companies. Fletcher also stated that the transaction would be "virtually invisible to the WIN Companies' customers" but was being done simply to, among other things, "enable the WIN Companies to improve their financial condition."

58.     The Kentucky PSC made its determination based on a hearing it held on November 13, 2014, in which Robert Gunderman testified that the operating subsidiaries were the true beneficiaries of the arrangement, and that the agreement between CS&L and Windstream is "just for administrative ease in terms of transacting—transacting the lease between entities," but that it is "for the benefit of the operating subsidiaries." Based on this testimony, the Kentucky PSC gave approval that "[t]he Lease will provide the [o]perating [c]ompanies with exclusive rights to use the distribution systems."

59.     Also, during this November 13, 2014 hearing, Robert Gunderman assured Kentucky regulators that the proposed transaction would not violate any of Windstream's debt agreements or restrictive covenants:

> Q: So my question to you would be, are there covenants in any of Windstream's debt agreements that would limit Windstream's operations, businesses, or financial positions company-wide?
>
> A: As part of this transaction, we have no concerns with any covenants within our indentures or our existing credit agreement.

60.     While Windstream was telling regulators that the Windstream operating subsidiaries were the true beneficiaries of the leaseback plan, and the lease was simply being entered into at the corporate level for administrative benefits, the Windstream insiders, who were either to become Uniti insiders, worked closely on this with Uniti insiders, or were closely related to a Uniti insider, knew that this was a direct violation of the Indenture.

61.     As Fletcher stated in testimony during litigation commenced in connection with the Indenture (the "Indenture Litigation"):

> Q: The question is, at the time that this transaction was being planned, you were aware that if the transferor subsidiaries signed the master lease, that would have been a clear violation of the indenture at issue in this case.
>
> A: Yes.

62.     Windstream executives succeeded in obtaining regulatory approval by asserting that the operating subsidiaries were the true beneficiaries of the Master Lease, while at the same time, promoting the transaction to investors without mention of the restrictive covenant violation. The operating subsidiaries would use their assets and pay all rent as required under the lease. Furthermore, Uniti would only receive payment from Windstream after and if it received payment from the operating subsidiaries.

63.     Gunderman worked closely with Windstream in developing and implementing the Uniti Spin-Off and sale-leaseback plan.  He was fully aware of Windstream's messaging about the transaction to state regulators.

64.     On March 25, 2015, the Windstream board approved the Uniti Spin-Off. Windstream had done an end-run around the restrictive covenants in the Indenture and gave shareholders the impression that they were not violating these restrictions.  Windstream borrowed millions of dollars with the specific condition that they would not sell and leaseback assets, and then set up an arrangement whereby their operating subsidiaries would sell their assets to Uniti, which would then lease them back to Windstream for the exclusive use by the subsidiaries.  Then, Windstream, upon receiving rent payments from the subsidiaries, would pay Uniti under the Master Lease.  Windstream and Uniti insiders knew this was a violation of the Indenture, despite their public assertions to the contrary.

65.     Thus, by April 20, 2015, the Individual Defendants knew or recklessly disregarded that their actions were an attempt to avoid the Indenture's restrictive covenants which exposed Windstream to a material risk that the transaction could be successfully challenged by Windstream noteholders in court, as it ultimately was.  This information, along with the material and likely risks posed to Windstream's viability (and ultimately Uniti, as Windstream is Uniti's largest customer), should have been made available to shareholders.  Instead, throughout the Relevant Period, the Individual Defendants repeatedly kept this information from investors.

### C.     The Company's False and Misleading Statements

66.     On March 26, 2015, Gunderman wrote a letter to "Future Shareholder of Communications Sales & Leasing, Inc." ("Future Shareholder Letter"), in which he described the sale and leaseback arrangement and the value it was creating for the Company:

It is our pleasure to welcome you as a shareholder of our company, [CS&L]. Following the distribution of no less than 80.1 percent of the outstanding shares of CS&L common stock by [Windstream] to its shareholders, CS&L will be an independent, publicly traded real estate investment trust that will own, acquire and lease distribution systems serving the communications infrastructure industry and potentially other industries. We will strive to be a significant provider of capital and financing to the communication industry.

Our initial properties will include, among other things, an extensive communications distribution system, comprised of approximately 66,000 route miles of fiber optic cable lines, 235,000 route miles of copper cable lines, and central office land and buildings across 37 states that are currently owned by Windstream. This distribution system will be leased to Windstream [] on a long-term, triple-net basis. We expect to diversify our tenant base in the future by acquiring additional properties and leasing them to other local, regional and national telecommunications providers. We also expect to grow and diversify our portfolio through the acquisition of properties in different geographic markets, and in different asset classes.

Our goal at CS&L is to create value for our shareholders and we plan to accomplish this by growing our dividend distributions over time. CS&L initially expects to pay an annual dividend of $2.40 per share.

67.    Also on March 26, 2015, in another letter to Shareholders of Windstream, which was filed with the Securities and Exchange Commission ("SEC") and attached to a Form 8-K signed by Mr. Gunderman, it was stated that after the Uniti Spin-Off, "CS&L will lease the assets to Windstream [] through an exclusive long-term triple-net lease."

68.    Additionally, Uniti highlighted the financial stability of Windstream and its ability to pay the lease obligations for years to come when it stated, under the heading "Financially Secure Tenant," that "Windstream's liquidity position, modest leverage and ability to generate significant free cash flow should provide it with the ability to pay the annual lease obligations to CS&L [Uniti] for the foreseeable future."

69.    The Relevant Period starts on April 20, 2015, when Uniti common stock began trading on NASDAQ and continues to the present.

70.    The statements in the Future Shareholder Letter and the March 26, 2015 letter to Shareholders of Windstream with the Form 8-K attached were materially false and misleading as they failed to disclose the following adverse facts which were known to the Individual Defendants or recklessly disregarded by them as follows:

(a) that the sale-leaseback transaction between Windstream and Uniti was a highly risky attempt to make an end-run around the restrictive covenants in the Indenture;

(b) that Windstream was violating the restrictive covenants contained in its notes by entering into the sale-leaseback arrangement with Uniti and that this violation was going to lead to the noteholder accelerating the notes obligating Windstream to immediately repay hundreds of millions of dollars which would bankrupt Windstream and have severe financial consequences for Uniti; and

(c) as a result of the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about Uniti, its revenues, earnings, and prospects.

71.    On June 10, 2015, before the market opened, Defendants Gunderman and Wallace gave a presentation during REITWeek 2015, the National Association of Real Estate Investment Trust ("NAREIT")'s Investor Forum, held at the New York Hilton Midtown in New York City on June 9-11, 2015.  In discussing the "Universe of Potential Partners" in the "Fragmented Telecom Industry" (including potential business partners in the Fiber/Competitive, ILEC/RLEC, Cable, and other data center segments) available to the Company, Gunderman and Wallace touted their "Deep Familiarity with Sale Leaseback Transactions," which was, according to them, one of the ways the Company could structure future growth transactions.

72.    On November 14, 2016, Uniti held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Gunderman stated without condition that they would consider additional sale-leasebacks with Windstream, misleadingly implying that doing so imposed no risk, by stating, in pertinent part:

> [I]f [sale-leaseback] is an option that Windstream wants to pursue, we are very
> happy to engage in discussions around that to see if there is something that makes
> sense for both of us.
>
> I think that in general if we can find ways to help our largest customer and to do
> things that are credit enhancing for our largest customer, we are going to look very,
> very hard at that. But as we have mentioned before, our goal is to diversify and we
> will always look at potential sale-leaseback options, additional sale-leaseback
> options with Windstream in the context of other options that we have and we will
> prioritize those appropriately at the time.

73.     On February 23, 2017, Uniti filed its Form 10-K for Fiscal Year 2016 with the SEC,

which was signed by Gunderman, Wallace, and the Director Defendants (the "2016 Form 10-K").

In the 2016 Form 10-K, Uniti misleadingly characterized Windstream as the "lessee of the

Distribution Systems pursuant to the Master Lease," without disclosing that the Windstream

operating subsidiaries were the *de facto* lessees, as they had admitted to state regulators, and

without disclosing any risk of a violation of the restrictive covenant in the Indenture.

74.     In the 2016 Form 10-K, Uniti highlighted the risk that Windstream represented a

significant portion of its business and that Uniti's success depended significantly on the viability

of Windstream, describing Windstream as its "anchor tenant" that "provide[d] [Uniti] with a base

of stable and highly predictable rent revenues as an initial platform for us to grow and diversify

our portfolio and tenant base," but made no mention of the risk associated with the sale-leaseback

arrangement.

75.     In the 2016 Form 10-K, Uniti stated that because Windstream represented a

substantial portion of Uniti's revenue, there could be a material impact on Uniti's results if

Windstream experiences operating difficulties.  The 2016 Form 10-K stated in pertinent part as

follows:

> Because a substantial portion of our revenue is derived from lease payments by
> Windstream pursuant to the Master Lease, there could be a material adverse impact
> on our consolidated results of operations, liquidity and/or financial condition if

Windstream experiences operating difficulties and becomes unable to generate sufficient cash to make payments to us under the Master Lease. In recent years, Windstream has experienced annual declines in its total revenue and sales. Accordingly, we monitor the credit quality of Windstream through numerous methods, including by (i) reviewing the credit ratings of Windstream by nationally recognized credit rating agencies, (ii) reviewing the financial statements of Windstream that are publicly available and that are required to be delivered to us pursuant to the Master Lease, (iii) monitoring news reports regarding Windstream and its businesses, (iv) conducting research to ascertain industry trends potentially affecting Windstream, and (v) monitoring the timeliness of its lease payments.

76.     On August 3, 2017, Uniti filed a Form 10-Q filed with the SEC which was signed by Wallace and Vice President and Chief Accounting Officer, Blake Schuhmacher.  In this Form 10-Q, Uniti again described the Uniti Spin-Off from Windstream and the sale-leaseback arrangement, as well as the importance of Windstream's leasing revenue, without ever mentioning the risks associated with Windstream's restrictive covenant violation.  The Form 10-Q stated in pertinent part as follows:

On April 24, 2015, [Uniti] … was separated and spun-off (the "[Uniti] Spin-Off") from [Windstream] … pursuant to which Windstream contributed certain telecommunications network assets, including fiber and copper networks and other real estate (the "Distribution Systems") and a small consumer competitive local exchange carrier ("CLEC") business (the "Consumer CLEC Business") to Uniti and Uniti issued common stock and indebtedness and paid cash obtained from borrowings under Uniti's senior credit facilities to Windstream. In connection with the [Uniti] Spin-Off, we entered into a long-term exclusive triple-net lease [Master Lease] with Windstream, pursuant to which a substantial portion of our real property is leased to Windstream and from which substantially all of our leasing revenues are currently derived.

77.     That same day, Uniti held an earnings conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, in response to a question about Windstream's decision to cut its dividend, Gunderman characterized the lease payments to Uniti from Windstream as "very, very safe and a very high-priority payment from their perspective," and they "remain highly confident in-that lease payment."

78.     The statements referenced above in ¶¶66-77 were materially false and misleading because they failed to disclose adverse facts which were known to the Individual Defendants—that the lease-back was a highly risky attempt to make an end-run around the restrictive covenants in the Indenture, that Windstream was violating the restrictive covenants contained in its notes by entering into the sale-leaseback arrangement with Uniti, and that this violation was going to lead to the noteholder accelerating the notes obligating Windstream to immediately repay hundreds of millions of dollars, which would bankrupt Windstream and have severe financial consequences for Uniti, and, as a result, the Individual Defendants lacked a reasonable basis for their positive statements about Uniti and its revenues, earnings, and prospects.

79.     On September 21, 2017, Aurelius, the beneficial owner of more than 25% of Windstream's outstanding notes under the Indenture, provided written notice to Windstream that the Uniti Spin-Off and sale-leaseback transaction was a violation of the Indenture's restrictive covenants.

80.     On September 25, 2017, Windstream acknowledged in a Form 8-K it filed with the SEC that it received the notice of default but denied that any prohibited sale-leaseback transaction occurred and played down the issue.

81.     The market was unconvinced, and the news had an immediate negative effect on the price of Uniti common stock.  On September 26, 2017, the first full day of trading after Windstream filed its Form 8-K, the price of Uniti stock declined from $17.36 per share at the close of trading on September 25, 2017 to $15.65 per share at the close of trading on September 26, 2017, a decline of nearly 10%.

82.     The price of Uniti stock continued to decline on September 27, 2017, and by September 29, 2017, with no other material company-specific information disclosed, the price of Uniti stock fell another 6% to $14.66 per share.

83.     On October 4, 2017, Wallace participated in the Deutsche Bank Leveraged Finance Conference where he made no mention of the Windstream default allegation.  However, he did take the opportunity to tout the structure of the Windstream lease stating in pertinent part as follows:

> We do think the Windstream lease in and of itself is well-structured. It is structured, as I mentioned, to be as a master lease. It is important to Windstream from an operations standpoint in terms of the scale and the number of customers that they serve by having access to the lease. It is a master lease. As we've said before, they are designed to be in the - as a single lease, they're designed to be indivisible. It is a single rent payment, so it's not – it's designed so that it can't be subdivided or cherry picked.  It is–in any sort of a distress situation, it is required to be either accepted or rejected in full. And acceptance would require that the lease be – that the tenant be in compliance. Windstream is the carrier last resort, so it's important for Windstream to continue to have access to the lease network to serve the customers and to fulfill the regular required obligations as well. So we think the [m]aster [l]ease is well-crafted and we think it's a priority payment from our standpoint and from Windstream's standpoint as well.

84.     When asked about "the elephant in the room," which was Windstream's financial situation, Wallace asserted that Windstream's decision to cut the dividend was actually "credit enhancing," and that the Company had no concerns around Windstream's financial situation.  The following exchange took place:

**Unidentified Analyst**

Okay. All right. So getting to some Q&A. Towards the end of the presentation, we talked about Uniti Leasing. And I just want to get the elephant in the room with Windstream. So Windstream is a financial situation. It's been a key focus for investors, especially considering 70% of your revenue still comes from them. Especially true, I think, following a weaker second quarter where Windstream eliminated its dividend. So maybe to start, can you talk about Windstream's decision to cut its dividend? And more importantly, I guess, what that implies for your rental revenues coming from them?

**Mark A. Wallace** - Uniti Group Inc. - CFO, EVP and Treasurer

Sure. So I think Windstream, on their decision to eliminate the dividend, I think from our standpoint, from a landlord standpoint, we find it to be credit enhancing. So obviously, with that decision, they'll be retaining more cash flows in their business. So we think it's credit-enhancing from that standpoint.

Now obviously, I would say that I think the market had a negative reaction to it based on the pressure that resulted on their securities from that. And I think, as far as I can tell, I think that's a result of, I think, people viewed the dividend elimination as being a harbinger of – or a foreshadowing that there's – that Windstream's future results would not be what the market was expecting those to be, and that, that was – that would be the reason for them to eliminate the dividend. I don't think that's what they intended at all. I think they intended it to be just a capital finance position. They felt like they weren't getting credit for the dividend. But – so we were certainly surprised by the reaction to it. I think they were as well. I do think that to the extent that there was – that I'm correct about what I believe, people took it to mean from a perception standpoint. I think Windstream has been at conferences. They hosted a separate conference with investors, and they tried to make sure that – correct any misperceptions in the marketplace. So as I've kind of heard them articulate their strategy, they're focused on, and certainly, you should pay attention to what Windstream says about its own operations, so they should be the primary spokesman, not me. But as I understand it, I think they have a lot initiatives going on right now that I fully expect them to be successful at executing on, whether it be the synergy realization from Earthlink and Broadview, whether it be the reduction of interconnection costs. I think they've spoken about CapEx and working capital being improved in the second half of the year versus first half of the year. They've also talked recently about asset sales and looking at monetizing some of their unutilized fiber. So I think all those things were good. I think they've got a lot of things they're focused on right now. And as I said earlier, I think I'll expect them to be successful to execute.

*       *       *

**Unidentified Analyst**

How about when we think about leverage for the business, can you talk about your preferred target leverage range for the company? And whether you would consider potentially taking that lower given some of the concern around Windstream's financial situation?

**Mark A. Wallace** - Uniti Group Inc. - CFO, EVP and Treasurer

So our – what we've said is that we've been on a net leverage basis at about 5.7 to 5.8x. We've been in that – have said for a while, that's our target range and there's no change in that target range. The actual kind of month-to-month leverage will

change as we draw down on the revolver for acquisitions and then term out and replace that with permanent capital. But the target range is still about the same as it has been.

**Unidentified Analyst**

Okay. And does Windstream's financial situation impact how you think about that on a go forward basis?

**Mark A. Wallace** - Uniti Group Inc. - CFO, EVP and Treasurer

No. No change.

85.     On October 12, 2017, U.S. Bank, the Trustee, filed the Indenture Litigation alleging that the Uniti Spin-Off and sale-leaseback transaction violated the Indenture.  The action was filed by the Trustee in the United States District Court for the Southern District of New York, captioned *U.S. Bank N.A. v. Windstream Servs., LLC*, No. 17-cv-07857-JMF (S.D.N.Y. Oct. 12, 2017).  The alleged default, if uncured, would trigger an acceleration provision in the Indenture that would make the Notes' entire aggregate principal amount, plus any unpaid interest, due immediately – a figure in the hundreds of millions of dollars.

86.     On November 2, 2017, Uniti filed a Form 10-Q with the SEC which was signed by Wallace and Blake Schuhmacher.  In the Form 10-Q, Uniti acknowledged that Windstream Services, LLC received a notice of default dated September 21, 2017.  The notice alleged, among other things, that Windstream Services, LLC violated certain restrictive covenants of the Indenture governing the Windstream notes in connection with the Uniti Spin-Off.  Uniti did not reveal that it had been aware of this risk and downplayed the magnitude of it.

87.     That same day, Uniti held an earnings conference call with analysts and investors to discuss the Company's earnings and operations.  During the earnings conference call, Gunderman stated that they would not respond to questions regarding Windstream's current

litigation but "remind[ed]" everyone that Windstream had "very competent counsel and advisors involved in the initial spin-off."

88.     On November 2, 2017, after the markets closed, Defendants Gunderman and Wallace held a conference call with analysts and investors to discuss Uniti's 3Q17 financial results and the state of its business. The conference call was also webcast live on the Company's website. Defendants Gunderman and Wallace spoke on the call. In his prepared remarks, Gunderman expressly disclaimed the possibility of a ruling in favor of Aurelius in the pending litigation – insisting that Windstream "had very competent counsel and advisers involved in the initial spin-off and additional well-respected law firms" and as a result "Windstream [would] ultimately have a favorable outcome."

89.     On November 7, 2017, at the Wells Fargo Media & Telecom Conference, Gunderman voiced his frustration with the fact that there was even a question about the validity of the sale-leaseback transaction and stated that he remains very confident in the lease payments, stating in pertinent part, as follows:

> We find it extremely frustrating, especially on behalf of our shareholders that there's so much turmoil going on, and especially when we think the claim itself is just manufactured. We've been following it very, very closely. We've contingency planned for all conceivable outcomes. We've done a deeper dive on our lease and our different scenarios than we ever have before and continue to be highly confident in the leased, lease payment, the protections that we have in all scenarios. So none of that has changed. And it's really the same thing we've been saying from Day 1, even before we were spun out. So none of that has changed. And we do think that the trends and the tide are moving in Windstream's favor in terms of the things that they're dealing with. And there's going to be a lot more clarity on all of this over the coming weeks. But in the meantime, we're staying focused on our business. We're staying focused on growing. And to your question, there have been no conversations with Windstream about renegotiating the lease, not in the past and not right now.

90.     On November 29, 2017, Defendant Wallace gave a presentation to investors, analysts, and market participants at the Bank of America Merrill Lynch Leveraged Finance

Conference on behalf of Uniti. When questioned about ongoing concerns that Windstream might

end up in a default scenario, Wallace again emphasized that Uniti had reviewed the Master Lease

and concluded that Windstream would receive a favorable outcome in the Indenture Litigation:

> Yes, so let me start with Windstream. So ***we have a very high degree of confidence that Windstream is going to prevail*** in the litigation. ***We have a very high degree of confidence that they're going to have favorable outcome*** to this. And in many [sic] case, I would say that we think that there's a good likelihood that it might be resolved in a relatively short period of time favorably for Windstream. So with that respect, I would say that we would echo a similar degree of confidence that Windstream has stated as well. Look, I think that we have – the situation, since the volatility some of the claims have been made, we've gone back and looked at our lease agreement. We've consulted our counsel about the lease agreement. We've gone back and done a deep dive into it. We have ***every confidence in the strength of our lease agreement that we have been articulating from the very first days that we were spun off***. So ***we have tremendous confidence in the lease***. We have confidence in the lease protections, the way the lease was structured as a master lease. And so I think to your point, even in a downside scenario, no matter how low the probability, I think it is low, I think that we are – I think we're as protected as any landlord can be. And so I think the Windstream lease was well-crafted, and ***we have [a] very high degree of confidence*** that Windstream will continue to make payments and will continue to receive an uninterrupted lease stream.

91.     The following week, on December 4, 2017, in a presentation to investors, analysts,

and market participants at the UBS Global Media and Communications Conference on behalf of

Uniti, Defendant Wallace again stressed that Uniti was "highly confident that Windstream [would]

have a favorable outcome in the litigation."

92.     On March 1, 2018, Defendants filed with the SEC Uniti's 2017 Form 10-K, signed

by Defendants Kenneth Gunderman, Wallace, and the Director Defendants.  The 2017 Form 10-

K contained the following "risk factor" related to the Company's relationship with Windstream:

> In recent years, Windstream has experienced annual declines in its total revenue and sales. Most recently, Windstream has endured a challenge from an entity who acquired certain Windstream debt securities for the purpose of seeking an "event of default" under such securities relating to the SpinOff. An actual "event of default" would permit the trustee or holders of at least 25% in aggregate principal amount of outstanding of such Windstream debt securities to declare the principal amount of all outstanding Windstream debt to be immediately due and payable. Such an

outcome would trigger cross-default provisions in Windstream's other debt instruments, including Windstream's existing credit facility, which, in turn, would trigger a default under the Master Lease. A default by Windstream under the Master Lease could materially adversely affect our business, assets, financial position, and results of operations, including our ability to pay dividends to our stockholders as required to maintain our status as a REIT.

93.     On September 6, 2018, at the Bank of America Merrill Lynch 2018 Media, Communications & Entertainment Conference, Defendant Wallace acknowledged the impact of the litigation on Uniti, but again insisted that Windstream would receive a favorable ruling:

> But I think it also – it is also the lawsuit relative to us. And because it would be – **with the litigation overhang there and then there's always some risk, I'll admit, small, as to what the impact of an unfavorable position could be**.
>
> Now that said, we fully expect – I believe Windstream fully expects as well, but I think they're speaking at the conference and I think they'll affirm it. **We fully expect to have a favorable decision**. And sooner is better from that standpoint, and **I think they fully expect to have a favorable outcome on the court ruling as well**.
>
> *            *            *
>
> [O]ur story has been pretty consistent. We've always felt good about the master lease. **We've always felt good about the protections in the master lease. We always thought it was a priority payment for Windstream**.

94.     The statements referenced in ¶¶80, 83-93 were false and misleading when made in that they omitted or misrepresented material facts, which were then known to or recklessly disregarded by Defendants, including:

> A.       Defendants failed to disclose that the Spin-Off constituted a sale-leaseback transaction between Uniti and the Windstream Operating Subsidiaries in direct violation of Windstream's Indenture's restrictive covenants.   Indeed, Fletcher admitted that he knew at the time that "if the transferor . . . signed the master lease, that would have been a clear violation of the indenture at issue in this case."

B.      Contrary to Defendants' representations, Uniti's lease payment from Windstream was not "very, very, safe" nor did the Master Lease have protections that safeguarded the Company "in all cases." Instead, Defendants were aware that the Master Lease was a financing arrangement. This not only resulted in a breach of §4.09 of the Indenture, but it also carried with it the significant risk that if Windstream filed for bankruptcy protection, and was able to successfully recharacterize the Master Lease as a financing, Uniti's claim in a Windstream bankruptcy to rent payments would be almost entirely unsecured and structurally subordinated to other creditors' claims.

C.      Defendants were not in fact "confiden[t]" in Windstream's management because they knew that Windstream executives, who were on both sides of the Spin-Off deal, structured the Master Lease as a workaround to the Indenture's prohibition of sale-leaseback transactions, and knew that the Spin-Off was in violation of that covenant.

95.     In reaction to Gunderman and Wallace's positive statements concerning the Indenture Litigation, the price of Uniti stock reversed its decline.  From November 7, 2017 through February 15, 2019, the stock price rose from $16.53 to $19.98, an increase of over 20%.

**E.      The February 15, 2019 Ruling in the Indenture Litigation Finding that the Spin-Off and Mater Lease Transaction Breached the Indenture, and the Ensuing Fallout**

96.     On February 15, 2019, United States District Court Judge Jesse M. Furman released his finding that the Uniti Spin-Off and the sale-leaseback transaction breached the Indenture. Judge Furman's decision was based on a number of factors, including the fact that the subsidiaries had exclusive use of the leased property and the fact that the subsidiaries subleased the property

to others which they wouldn't be able to do without a leasehold interest in the property.  Further, the subsidiaries are paying "healthy consideration" for their right to use the assets. The court concluded that it "walks like a lease and talks like a lease . . . because it is a lease."

97.     The court took the additional step of holding that Windstream was "judicially estopped from denying that the [Windstream operating subsidiaries] 'lease' the Transferred Assets."  The court explained, "having benefited from repeated statements to state regulators that the [Windstream operating subsidiaries] would lease back the Transferred Assets, [Windstream] Services is estopped from now denying that the [Windstream operating subsidiaries] did in fact lease those assets — even if doing so would not serve its interests."

98.     The court concluded that the Uniti Spin-Off was plainly a sale and leaseback, and making Windstream the sole signatory on the Master Lease did not change those facts. Accordingly, the Trustees and Aurelius were entitled to a judgment against Windstream and awarded Aurelius a money judgment of over $300 million.

99.     In response, the price of Uniti stock declined over 45% from $19.98 per share when the market closed on February 15, 2019, to $10.87 when the market opened on February 19, 2019, the next trading day.

100.     On February 19, 2019, the first trading day after Judge Furman's ruling, Uniti issued a statement about it and the impact the ruling had on the Company's business and the Master Lease. In that statement, Defendant Kenneth Gunderman stated: "'It is our understanding that Windstream intends to take action and pursue all available options. The validity of our master lease agreement with Windstream was not impacted by the ruling, and access to our network remains critical to Windstream's operations and its ability to serve its customers.'" Gunderman also assured Uniti's investors that: "'We are focused on working through the challenges related to the court

ruling and continue to be committed to serving the interest of our stockholders, our customers, and our other partners.'"

101.    Over the next three days, the price of Uniti stock declined further to $9.23 when the market closed on February 22, 2019.  From February 15, 2019 through February 22, 2019, the stock declined over 53%, which can be attributed entirely to the Windstream default.

102.    On February 25, 2019, Windstream announced it had filed for Chapter 11 bankruptcy as a result of the judge's decision in the Indenture Litigation.  As a result of Windstream's bankruptcy, Uniti's stock price declined more than 9% from a close of $10.60 on February 25, 2019 to a close of $9.64 on February 28, 2019.

103.    In a press release issued on February 27, 2019, Gunderman, in an unsubstantiated attempt to stop the bleeding, stated that they "believe [Windstream] will successfully navigate through the reorganization process."

104.    On March 18, 2019, Uniti filed its Form 10-K for Fiscal Year 2018 with the SEC which was signed by Gunderman, Wallace, and the Director Defendants (the "2018 Form 10-K"). In the 2018 Form 10-K, Uniti stated that its auditors, PricewaterhouseCoopers LLP, have "substantial doubt as to whether [Uniti] could continue as a going concern within one year after the date the financial statements are issued as a result of Windstream's bankruptcy petition and [its] potential uncertain effects on the Master Lease."  They added that they included the going concern opinion letter in their 2018 audited financial statement because not doing so would be a breach of the covenants of their Credit Agreement, but also stated that they "expect Windstream will continue to perform on the Master Lease and believe it is unlikely that Windstream will reject the Master Lease because the Master Lease is central to Windstream's operations."

105.    In the 2018 Form 10-K, Uniti further downplayed the concerns, stating that it was their expectation "that any disruption in payments by Windstream would be limited" because Uniti's Master Lease is essential to Windstream's operations and based on this, Uniti "would have enough liquidity to fund our cash needs within one year after the date the financial statements are issued."

106.    Uniti further repeatedly asserted that "***management has concluded the probability of a rejection of the Master Lease to be remote***" and provided financial statements that did not include any adjustment that might be necessary if the Company was unable to continue as a going concern.

107.    Moreover, in the 2018 Form 10-K, Uniti added that "we anticipate that we will have sufficient access to liquidity to fund our cash needs," and will be "continuing to invest in our network infrastructure across our Uniti Leasing, Uniti Fiber and Uniti Towers portfolios."  The statements in its press release and 2018 Form 10-K were materially false and misleading as they failed to disclose that Uniti was running out of sufficient liquidity and would soon need to issue additional debt if it was to continue operations.

108.    On May 14, 2019, Defendant Wallace gave a presentation to investors, analysts, and market participants at the JPMorgan Global Technology, Media and Communications Conference on behalf of Uniti.  In discussing the Company's relationship with Windstream and the impact of Windstream's bankruptcy to Uniti, Wallace emphasized that there was no real risk of Windstream defaulting on the Master Lease:

> The bankruptcy process so far has played out pretty much as we expected. . . . [T]here is a recognition that the Windstream network that we leased to them is mission-critical, so that's good to – that everybody has that understanding, which we've always have [sic] said that its mission-critical to their operations. And as I've – as we've talked to even investors and even this morning. I think there's a

recognition more and more that it's in everybody's interest to proceed through the bankruptcy process as quickly as possible.

109.    In fact, Defendant Wallace told investors at the conference that Windstream's

bankruptcy was a positive event for Uniti:

> I think once Windstream emerges in kind of the base cases, the lease either gets assumed as is or gets consensually renegotiated on good terms for both parties. I think we're pretty optimistic again about how that plays out in terms of Uniti's long-term success here. And by that, what I mean is that expecting Windstream to come – to emerge from bankruptcy lower leveraged and there – and also – and therefore, a better credit profile, I think that's going to enhance the cost of capital for Uniti Group significantly.

110.    Defendants again appeared at REITWeek, on June 5, 2019 on behalf of Uniti.  In

response to a question from David Barden from Bank of America Merrill Lynch about how

Windstream's bankruptcy was affecting the Company, Defendant Kenneth Gunderman repeated

the refrain that Uniti was operating without impact from Windstream's bankruptcy and again

emphasized Windstream's bankruptcy was actually a positive thing for the Company:

> And so we're now a couple of months into the filing, and I would say that I'm very, very pleased with the preparation that we had done in advance and I'm [very] pleased with our execution on our plan since then. And so as it relates to the 3 operating businesses that we have or the 3 businesses that we have, we've really had no disruption of service. We've had no hiccups. We've just continued to move along, investing in our business uninterrupted at Uniti Fiber, Uniti Towers and Uniti Leasing. And so I'm very pleased with our progress there, both organic growth and even some inorganic growth.

*      *      *

> So we've been pleased at the desire to move quickly. We've been pleased that the various constituents have universally recognized the mission critical nature of the network that we provide to Windstream . . . .

> At some point, this process, the bankruptcy process is going to be behind us sometime in the next couple of quarters, several quarters. And when that day comes, we're going to emerge as a stronger company and we're going to have a stronger, large tenant in Windstream, and so we're looking forward to that day.

111.    Defendant Gunderman also repeated the statement that the "lease" with Windstream was a "true master lease" and that it was "specifically designed for a bankruptcy scenario to protect [Uniti]."

112.    Despite Defendants' repeated assurances that the validity of Uniti's Master Lease agreement with Windstream was not impacted by Judge Furman's ruling in the Indenture Litigation and that there was no "risk of rejection" of the Master Lease, Defendants knew that Windstream could successfully recharacterize the lease as a financing arrangement, which would result in a breach of § 4.09 of the Indenture and cause Uniti's claim in bankruptcy to Windstream's rent payments to be entirely unsecured and structurally subordinated to other creditors' claims.

113.    Furthermore, the Company did not, in fact, have the "ability to navigate the Windstream bankruptcy proceedings without having to raise external capital" should Windstream challenge the validity of the Master Lease in bankruptcy, putting two-thirds of Uniti's revenue in jeopardy – a risk Defendants downplayed but knew to be more than a "remote" possibility that was "irrational."

114.    Despite Uniti's repeated assertions that they did not have any liquidity concerns, and would not need to raise external capital to fund Uniti's operations, on June 24, 2019, Uniti announced a note offering of $300 million aggregate principal amount of exchangeable senior notes due 2024, with an option to purchase up to an additional $45 million aggregate principal amount of the Exchangeable Notes during a 13-day period beginning on, and including, the first day on which the Exchangeable Notes are issued.

115.    As a result, the price of Uniti stock dropped another 12%, from $10.69 when the market closed on June 24, 2019, to $9.38 when the market closed on June 25, 2019, on very heavy volume.

116.    The market for Uniti common stock was open, well-developed, and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Uniti common stock traded at artificially inflated prices during the time in question.

117.    During this period, the Individual Defendants materially misled the investing public, thereby inflating the price of Uniti common stock by publicly issuing, or causing to be issued, false and misleading statements and omitting to disclose material facts necessary to make their statements not false and misleading.  These statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company and its business and operations.

**F.    The Misconduct Alleged Herein Caused the Company to Be Named as a Defendant in a Putative Federal Securities Class Action Litigation**

118.    The misconduct described herein has already caused significant damage to the Company.  Due to the false and misleading statements and omissions made by the Individual Defendants, Uniti has been subjected to the federal Securities Class Action.

119.    The Order in the Securities Class Action found that plaintiffs successfully pleaded misrepresentation, scienter, and loss causation.  Specifically, "[p]laintiffs have sufficiently alleged material misrepresentations because they have pleaded that defendants failed to disclose the prohibited structure of the spin-off transaction and Master Lease," "defendants had information indicating that their public statements were materially misleading . . . . because defendants were "intimately involved" in conceiving and negotiating the spin-off and master lease," and "defendants could have foreseen their economic loss . . . ." and plaintiffs actually suffered economic loss.

120.    As a result of the pending litigation, the Company has expended, and will continue to expend, significant sums of money defending itself and certain of the Individual Defendants.

## V.    DAMAGES/HARM TO UNITI

121.    As a direct and proximate result of Defendants' misconduct, Uniti has suffered and continues to suffer significant harm, including but not limited to:

A.    The loss of credibility associated with Uniti's dissemination of improper public statements concerning the violation of restrictive covenants through an improper sale and leaseback transaction and utterly failing to make a good faith effort to correct the problems, implement adequate controls, and prevent their reoccurrence;

B.    Legal and other costs incurred, and the distraction of, investigating and defending Uniti and defendants Gunderman and Wallace in the Securities Class Action, as well as potentially hundreds of millions of dollars in damages in connection with any settlement of or judgment in the Securities Class Action or any related litigation;

C.    Harm to Uniti's corporate image and goodwill.  For the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stock of companies which have been implicated in misleading the investing public, such that Uniti's ability to raise equity capital or debt on favorable terms in the future is now and will continue to be impaired. The Company will incur higher marginal costs of capital and debt because of the misconduct; and

D.    Costs incurred from compensation and benefits paid to Defendants and other members of Uniti's management while they were engaged in the

improper conduct alleged herein, which compensation was based in part on the Company's artificially inflated stock price.

## VI.   DEFENDANTS' DUTIES

### A.   Defendants' Fiduciary Duties

122.   By reason of their positions as officers and/or directors of Uniti and because of their responsibility to control the business and corporate affairs of the Company, Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.  Each Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of his or her personal interest or benefit.

123.   Because of their positions of control and authority as officers and/or directors of Uniti, Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Uniti, each Defendant had knowledge of material, nonpublic information regarding the Company.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations, and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

124.   At all times relevant hereto, each Defendant was the agent of each of the other Defendants and of Uniti and was at all relevant times acting within the course and scope of such agency.

125.    To discharge their duties, Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Uniti.  By virtue of such duties, Defendants were, and are, required to, among other things:

      a.     exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's Certificate of Incorporation and Bylaws);

      b.     neither violate nor knowingly permit any officer, director, or employee of Uniti to violate any applicable laws, rules, or regulations;

      c.     remain informed as to the status of Uniti's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

      d.     establish and maintain systematic and accurate records and reports of the business and affairs of Uniti and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

      e.     maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Uniti are conducted in accordance with all applicable laws, rules, and regulations; and

      f.     truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

**B.    Duties Pursuant to the Company's Code of Business Conduct and Ethics and Whistleblower Policy ("Code of Conduct" or "Code")**

126.    The Company's Code of Conduct was implemented so that Uniti's "business shall be conducted in accordance with the highest moral, legal and ethical standards." These guidelines apply to the Director Defendants in connection with their membership on Uniti's Board:

> This Code applies to the Company and its employees, officers and directors who act for, or on behalf of, the Company, including for the avoidance of doubt, the employees, officers and directors of each of the Company's subsidiaries. All of our officers, directors and employees must conduct themselves in accordance the principles of this Code and seek to avoid even the appearance of improper behavior.

127.    According to Uniti's Code of Conduct, the policy

> covers a wide range of business practices and procedures and provides guidance to enable and encourage the reporting of any conduct that appears to raise ethical or legal concerns, including conduct in connection with the Company's accounting, internal accounting controls, financial reporting or other auditing matters (collectively, "Accounting Matters") or conduct that violates federal securities law ("Securities Law Violations") or any other unlawful or unethical behavior such as conflicts of interest, bribery or kickbacks.

128.    According to Uniti's Code of Conduct, compliance with laws rules and regulations is as follows:

> Obeying the law, both in letter and in spirit, is the foundation on which this Company's ethical standards are built. All officers, directors and employees of the Company must respect and obey all applicable laws, rules and regulations governing the Company and the operation of its business. As a public reporting company with its stock trading on NASDAQ, the Company is also subject to regulation by the SEC and to the applicable listing standards of NASDAQ. All officers, directors and employees are expected at all times to conduct their activities on behalf of the Company in accordance with this principle. Although not all employees are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors, managers or other appropriate personnel.

129.    The Whistleblower section of Uniti's Code of Conduct highlights the important for all officers, directors, and employees of the Company to report concerns or complaints regarding

any questionable Accounting Matters and Securities Law violations including, without limitation, the following:

> • Fraud or deliberate error in the preparation, evaluation, review or audit of any financial statement of the Company;
>
> • Fraud or deliberate error in the recording and maintaining of financial records of the Company;
>
> • Deficiencies in or noncompliance with the Company's internal auditing controls;
>
> • Misrepresentation or false statement to or by a senior officer or accountant regarding a matter contained in the financial records, financial reports or audit reports of the Company;
>
> • Deviation from full and fair reporting of the Company's financial conditions; and
>
> • Any concerns about unlawful or unethical conduct by any employee, officer or director of the Company in violation of this Code.

130.    With respect to the integrity of Company books and records:

> Maintaining the integrity of all business records is essential to meeting the Company's financial, legal, regulatory, and operational objectives and requirements. All officers, directors and employees with any responsibility for the preparation of the Company's public reports, including all individuals involved in drafting, reviewing, and signing or certifying the information contained in those reports, have an obligation to ensure that the Company's financial statements, filings and submissions with the SEC, and other public statements and disclosures are complete, fair, accurate, timely, and understandable. ***You may not, under any circumstances, falsify or alter records or reports, prepare records or reports that do not accurately or adequately reflect the underlying transactions or activities, or knowingly approve such conduct.***
>
> As a public company, the Company is required to follow prescribed accounting principles and disclosure standards to report financial and other information accurately and completely. The Company also maintains appropriate internal controls and processes to ensure that financial and other disclosures comply with the law and SEC regulations. ***These internal controls are in place to promote the efficiency and effectiveness of business operations, reduce the risk of asset loss and help ensure the reliability of financial statements and compliance with laws and regulations.*** You must at all times comply with the disclosure standards and internal controls applicable to your job.

(Emphasis added).

131.    The Code of Conduct also imposes a duty on the Audit Committee to receive whistleblower complaints and other notices of potential violations.

**C.      Additional Duties of the Audit Committee Defendants**

132.    In addition to the duties discussed above, Defendants Banner, Bruce, Frantz, and Solomon (the "Audit Committee Defendants") owed specific duties to Uniti under the Audit Committee Charter ("Audit Charter").

133.    According to the Audit Charter, the Audit Committee's primary purposes are to oversee on behalf of the Board the following:

• the Company's accounting and financial reporting processes and the integrity of its financial statements;

• the audits of the Company's financial statements and the appointment, compensation, qualifications, independence and performance of the Company's independent auditors;

• the Company's compliance with legal and regulatory requirements;

• the performance of the Company's internal audit function, if any, internal accounting controls, disclosure controls and procedures and internal control over financial reporting; and

• the Company's enterprise risk management.

134.    Among other things, the "Purpose" section of the Audit Charter states, in part:

The Committee's function is one of oversight only and does not relieve management of its responsibilities to (1) make and keep books, records and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company, (2) devise and maintain an effective system of internal accounting controls, (3) devise and maintain effective disclosure controls and procedures and internal controls over financial reporting and (4) prepare financial statements that are accurate and complete and fairly present the financial condition, results of operations and cash flows of the Company and further does not relieve the independent auditors of their responsibilities relating to the audit or review of financial statements.

135.    According to the Audit Charter, the Audit Committee Defendants have several duties, including that the Audit Committee shall:

3. Establish and annually review procedures for the receipt, retention and confidential treatment of complaints regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters, which procedures shall be communicated to all employees on at least an annual basis.

*       *       *

5. Discuss with the independent auditors the matters required to be discussed by PCAOB Auditing Standard No. 18 and other related auditing standards, including without limitation information regarding the Company's relationships with related parties, the Company's significant unusual transactions and the Company's financial relationships and transactions with its executive officers, if any.

*       *       *

7. Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Business Conduct and Ethics.

8. Review with management and the independent auditor the interim financial statements to be included in the Company's Quarterly Reports on Form 10-Q, including their judgment about (i) the quality, not just the acceptability, of accounting principles, (ii) the reasonableness of significant judgments, and (iii) the clarity of the disclosures in the financial statements. Also, the Committee shall discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the independent auditor under generally accepted auditing standards, the federal securities laws and the rules and regulations of the SEC and NASDAQ.

9. Review with management and the independent auditor the Company's quarterly earnings press releases, as well as guidance and other financial information provided to analysts, rating agencies and other constituencies in the investment community. The Committee's responsibility to discuss earnings releases, financial information and earnings guidance may be done generally through discussions of the types of information to be disclosed and the type of presentation to be made. Without relieving the full Committee of its responsibility to undertake the foregoing general discussion, the Chairman of the Committee shall discuss with management and the independent auditor each of the Company's earnings releases, financial information and earnings guidance prior to public dissemination.

10. Review with management and the independent auditor the financial statements to be included in the Company's Annual Report on Form 10-K (or the annual report to stockholders if distributed prior to the filing of Form 10-K), including their judgment about (i) the quality, not just the acceptability, of accounting principles, (ii) the reasonableness of significant judgments, and (iii) the clarity of the disclosures in the financial statements, as well as management's assessment of internal control over financial reporting. Also, the Committee shall discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards, the federal securities laws and the rules and regulations of the SEC and the listing standards of NASDAQ.

\*     \*     \*

12. Monitor the ongoing review of the Company's systems of disclosure controls and procedures to ensure adequate disclosure control structures are in place and functioning properly within the various operating systems of the Company.

13. The Committee will periodically discuss and review, as appropriate, with the internal auditor, management and the independent auditors (1) the design and effectiveness of the Company's internal control over financial reporting and (2) any significant deficiencies or material weaknesses in that internal control, any change that has materially affected or is reasonably likely to materially affect that internal control (including special steps adopted in light of such a deficiency or weakness), and any fraud (whether or not material) that involves management or other employees who have a significant role in that internal control, that have been reported to the Committee.

14. Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's consolidated financial statements, including any significant change in the selection or application of accounting principles, any disagreements between management and the independent auditor, any major issues as to the adequacy of internal controls and any special steps adopted in light of any identified material control deficiencies.

\*     \*     \*

18. Review with the Company's legal department any matter that could have a material impact on the Company's financial statements.

\*     \*     \*

21. The Committee will periodically (1) inquire of and review with management, the members of the internal audit department and the independent auditors the Company's major financial and auditing risks or exposures, (2) discuss the steps

management has taken to monitor and control such risks and exposures, (3) discuss guidelines and policies with respect to risk management and (4) report the results of such review to the full Board.

**D.      Additional Duties of the Governance Committee Defendants**

136.      In addition to the duties discussed above, Frantz and Banner (the "Governance Committee Defendants") owed specific duties to Uniti under the Governance Committee Charter ("Governance Charter").  According to the Governance Charter, the Governance Committee's purpose is, among other things to "[d]evelop, recommend to the Board, and assess corporate governance policies for the company."

137.      The Governance Committee Defendants were charged with responsibilities including, but not limited to:

Establish[ing] and review[ing], in consultation with the Chairman of the Board and Chief Executive Officer, the criteria for the skills and characteristics required of Board members in the context of the composition and needs of the Board from time to time;

*      *      *

identify and recommend to the Board the appointees to be selected by the Board for service on the committees of the Board, including recommending a chairperson for each committee;

*      *      *

assist the Chairman of the Board with an annual evaluation of the Board and the Committees of the Board, management and of any director continuing education conducted during the prior year;

review and assess annually this Charter and the performance of the Committee and obtain the approval of the Board of any recommended changes to this Charter or the Committee;

have the authority to investigate matters with full access to all books, records, facilities, and personnel of the Company and the power to retain outside professionals for this purpose; and

undertake all further actions and discharge all further responsibilities imposed upon the Committee from time to time by applicable rules of the Securities and Exchange Commission, the listing standards of NASDAQ and any other statute or regulation applicable to the Company from time to time.

## VII.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

138.   In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

139.   During all times relevant hereto, Defendants, collectively and individually, initiated a course of conduct that was designed to and did, among other things: (a) deceive the investing public including stockholders of Uniti; and (b) permit flawed and ineffectual internal controls over the Company's operations.  In furtherance of this plan, conspiracy, and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

140.   Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, Defendants caused and/or allowed the improper conduct described herein.

141.   The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of state and federal law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and to conceal adverse information concerning the Company's business, operations, and future prospects.

142.   Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in the improper conduct described herein.  Because Defendants' actions occurred under the authority of the Board,

each Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

143.    Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII.   DERIVATIVE ALLEGATIONS

144.    Plaintiff brings this action derivatively in his own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Uniti as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by Defendants.

145.    Uniti is named as the Nominal Defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

146.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

147.    Due to the Board's inaction and de facto refusal to investigate the Demand before applicable statutes of limitation expire, prosecution of this action independent of the Board is in the best interests of the Company and its stockholders.

## IX.   WRONGFUL REFUSAL ALLEGATIONS

148.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

149.    Mr. Victor Szydlowski made his formal demand for litigation ("Demand") on March 31, 2020, where he demanded that the Board (i) undertake (or cause to be undertaken) an independent internal investigation into Individual Defendants' violations of Maryland and federal

law; and (ii) commence a civil action against Individual Defendants (and any others who may be similarly liable for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, aiding and abetting breaches of fiduciary duties, contribution, and indemnification against Individual Defendants) to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein, as well as take additional affirmative action to redress the wrongs described herein and prevent such wrongdoing from occurring again in the future.  **Exhibit A.**

150.    On April 10, 2020, Plaintiff's counsel received a letter from Mr. Brian Burnovski of Davis Polk & Wardwell LLP acknowledging receipt of the Demand and requesting proof of stock ownership throughout the Relevant Period.

151.    Plaintiff's counsel responded on April 15, 2020 by providing Mr. Szydlowski's confidential account statements showing that he was a current and continuous stockholder of Uniti common stock at all relevant times. Furthermore, Plaintiff's counsel informed the Company that Mr. Guzzo, another current and continuous holder of Uniti common stock at all relevant times, shared the concerns raised in the Demand and adopted and incorporated the Demand as if fully set forth therein. Mr. Guzzo's confidential account statements were included as well.  Plaintiff's counsel also reminded the Company that "under Maryland law, once a shareholder demand is made," the Board "'***must*** conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation.'"  (Emphasis in original).  **Exhibit B**.

152.    On April 24, 2020, Mr. Burnovski stated in his response letter, "I understand from the Company that the Demand will be reviewed by Uniti's board of directors in due course and

that the Board will determine at that time what steps are advisable in connection with the Demand. A further response will be provided after that." **Exhibit C**.

153.    After further correspondence, Mr. Burnovski wrote on May 22, 2020 that "[The Board] considered the Demand during its most recent regularly scheduled meeting and, after evaluating the potential benefits and risks, has determined in the exercise of its business judgment to defer for now any decision with respect to the allegations and requests set forth in the Demand." The letter continued, "[i]n light of the substantial overlap between the Demand and the allegations in the [Securities] Class Action and the SLF Action, and taking into consideration the nascent stage of those actions--and the fact that there are or soon will be pending motions to dismiss those actions in their entirety for failure to state a claim--the Board has decided, in the exercise of its business judgment, that it would not be in the Company best interests to make a determination with respect to the Demand, including to expend Company resources on an investigation or to commence any litigation on behalf of the Company, at this time." **Exhibit D**.

154.    On June 4, 2020, Plaintiff's counsel responded to the Company's May 22, 2020 letter.  Plaintiff's counsel reiterated the Board's obligations under Maryland law to conduct an investigation into the demand "regardless of whether the claims are dismissed in either [the Securities Class Action or the SLF Action]."  Plaintiff's counsel emphasized that the Board's decision to defer consideration of the Demand was causing irreparable harm to Uniti, including the effect of the passage of time on memories of witnesses.  Plaintiff's counsel also demanded that the Board retain independent counsel to investigate the Demand because, under Maryland law, representation of a corporation as an entity and the majority of its directors creates a conflict of interest for the attorney where, as here in connection with the matters raised in the Demand, the corporation's interests are adverse to those of the directors.  **Exhibit E**.

155.    On June 16, 2020, Mr. Burnovski responded to Plaintiff's June 4, 2020 correspondence, once again refusing to commence an investigation in response to the Demand and also refusing to reconsider the Board's decision to refrain from retaining independent counsel. **Exhibit F.**

156.    After corresponding for several more months, on April 15, 2021, Plaintiff's counsel requested an update regarding the Board's intentions related to its investigation of the Demand in light of Judge Brian S. Miller's order denying the Company's motion to dismiss in the Securities Class Action. **Exhibit G**.

157.    By May 10, 2021, well over a year after the Demand was made, "the Board has concluded in the exercise of its business judgment that it remains premature to make any decision with respect to the Demand, including whether to incur the expense and burdens of launching an investigation, at this time," pointing to a purported conflict between decisions betwixt the Securities Class Action and the SLF Action.  Uniti stated that it filed a motion for reconsideration or certification for interlocutory appeal in the Securities Class Action, using it as yet another excuse to defer initiating an investigation.  **Exhibit H**.

158.    On December 15, 2021, Plaintiff's counsel asked the Board for an update regarding the Board's intentions related to its investigation of the Demand, given that nearly 21 months had passed since the Demand was made and the Board had an additional six months from prior correspondence to make a decision.  **Exhibit I**.

159.    One week later, on December 22, 2021, Judge Brian S. Miller denied Uniti's motion for reconsideration or certification for interlocutory appeal.  Securities Class Action, ECF 104.

160.    In a letter dated January 4, 2022, nearly 2 years after the Demand was made, Uniti's counsel stated, "there have been no developments that warrant the Board revisiting [its May 10,

2021] conclusion." "Although the [Securities] Class Action against Uniti remains pending, that case remains in the early stages; in light of that, it is manifestly in Uniti's best interests to defer consideration of the Demand until that case has progressed further[.]" **Exhibit J**.

161.    Under Maryland law, once a shareholder demand is made, "the corporation's board of directors must conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation." *Shenker v. Laureate Educ., Inc*., 411 Md. 317, 983 A.2d 408, 423 (Md. 2009) (emphasis added).

162.    Here, the Board has determined, without any investigation, to defer consideration of the Demand indefinitely—throughout the pendency of the Securities Class Action and SLF Action, which could span months and even years into the future, particularly in the event that the Securities Class Action proceeds to summary judgment briefing and/or trial, and any appeal(s). *See e.g.*, **Exhibits C, D, H**.  An indefinite deferral of this nature will irreparably prejudice the Company and its claims; and a board cannot simply point to a pending, parallel lawsuit to justify its inaction in a derivative suit.

163.    Specifically, the harms complained of in the Demand are actively ongoing and remain unremedied by the Board, causing further damage to the Company with each passing day. In addition, while the Board is refusing to consider the allegations in the Demand, it is also actively forcing the Company to expend vast sums of money in defense of the very wrongdoers responsible for causing harm to the Company in the Securities Class Action, thereby further damaging the Company.  Moreover, depending on the length of the deferral, the Board's deferral will subject the Company's claims to the applicable statute of limitations period.  These actions by the Board cannot be reasonably interpreted to be in the best interests of the Company or in good faith.

164.    Moreover, under Maryland law, representation of a corporation as an entity and the majority of its directors creates a conflict of interest for the attorney where, as here in connection with the matters raised in the Demand, the corporation's interests are adverse to those of the directors.  *See* **Exhibit E** at 2 (collecting authority).  Davis Polk & Wardwell LLP's representation of both the Company and the Board in connection with the matters raised in the Demand is evident from the Board's responses to the Demand.  Thus, the Board engaged counsel to respond to the Demand that was unable to, on the one hand, zealously defend the Company and the Individual Defendants named in the Securities Class Action and the SLF Action, while on the other hand simultaneously investigate and independently recommend whether to prosecute claims against the same Individual Defendants on behalf of the Company in response to the Demand.  The Board's wrongful decision to indefinitely defer commencing an investigation pending the outcome of the Securities Class Action and the SLF Action stemmed from this conflict of interest.

165.    Thus, the Board's failure to respond within a reasonable time to the Demand, the Board's refusal to retain independent counsel to respond to the Demand, the Board's unwarranted and egregious deferral of its consideration of the Demand, and the Board's complete lack of action violates Maryland law and will unduly prejudice Plaintiff and the Company.  The Board's actions thus constitute a *de facto* wrongful refusal of the Demand.  Accordingly, Plaintiff has satisfied Maryland's demand requirement and may pursue this action on behalf of the Company.

## X.    CLAIMS FOR RELIEF

### COUNT I

**For Contribution for Violations of §10(b) and §21D of the Exchange Act**
**(Against Gunderman and Wallace)**

166.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167.    Defendants Gunderman and Wallace are named defendants in the Securities Class Action.

168.    Uniti is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for, *inter alia*, violations of § 10(b) of the Exchange Act.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the defendants as alleged herein.  The Company is entitled to receive contribution from those defendants in connection with the Securities Class Action against the Company.

169.    Defendants Gunderman and Wallace, as directors and officers and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including the content of public statements about Uniti, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and Rule 10b-5.  Further, defendants Gunderman and Wallace are liable under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

170.    As a result, defendants Gunderman and Wallace damaged Uniti and are liable to the Company for contribution.

171.    Plaintiff, on behalf of Uniti, has no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duties
### (Against the Individual Defendants)

172.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

52

173.     The Individual Defendants owed and owe Uniti fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Uniti the highest obligation of good faith, fair dealing, loyalty and due care in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with state and federal securities laws, rules and regulations, as well as the duty of candor and truthful disclosure with respect to their public statements.

174.     The Individual Defendants also owed and owe Uniti fiduciary duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual stockholders.  The Individual Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.

175.     In addition, the Individual Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Conduct and the charters of various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

176.     Each Individual Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

177.     The Individual Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

>     (a)     Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were

necessary to prevent or promptly correct the improper statements made on the Company's behalf;

(b)  Affirmatively and repeatedly making or allowing to be made, and/or failing to correct, improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, Uniti's financial results as well as its business, operations, and prospects;

(c)  Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws;

(d)  Awarding Uniti's senior executives lavish compensation packages, despite their responsibility for the Company's willful misconduct; and

(f)  Reappointing the same directors who had failed in their duties to the Audit Committee beginning at the latest in 2015 and continuing to this day.

178.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Uniti has sustained significant damages.  Accordingly, the Individual Defendants are liable to the Company.

179.  Plaintiff, on behalf of Uniti, has no adequate remedy at law.

## COUNT III

### Waste of Corporate Assets
### (Against the Individual Defendants)

180.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

181.  As a result of the misconduct described above, Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the

Indenture Litigation despite knowing or recklessly disregarding that the Spin Off violated the Indenture, as well as by forcing the Company to pay the improper, unnecessary and unjustified compensation, severance, and other awards and benefits to the Individual Defendants throughout the Relevant Period.

182.    Windstream's financial viability depended on not defaulting on its Notes. And Uniti's financial viability – as well as the employment and lucrative compensation packages of Defendant Kenneth Gunderman at Uniti and Robert Gunderman, his brother, at Windstream – in turn, depended on Windstream's continued success. If it were publicly disclosed that Windstream violated – or had engaged in a transaction that risked violating – the Indenture, and causing a default, the value of Uniti securities would crater.  Moreover, Defendants knew, or recklessly disregarded, that if they publicly identified the true nature of the risk that Windstream was in violation of the Indenture, then they essentially would be inviting Windstream's noteholders to do exactly what Aurelius did – cause the Indenture Trustee to file a breach of contract action against Windstream.

183.    Additionally, as a result of Individual Defendants' misstatements and failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, Uniti is subject to the Securities Class Action.  Individual Defendants have caused Uniti to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

184.    As a result of their waste of corporate assets, Individual Defendants are liable to the Company.

185.    Plaintiff, on behalf of Uniti, has no adequate remedy at law.

## COUNT IV

### Unjust Enrichment
### (Against the Individual Defendants)

186.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

187.    By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of Uniti.  Individual Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to the Company.

188.    Defendant Gunderman earned more than $5 million annually as CEO and President of Uniti following the Spin Off, so he was financially motivated to conceal the Windstream Indenture breach and any resulting risks to Uniti, and in fact did so.

189.    Plaintiff, as a stockholder and representative of Uniti, seeks restitution from Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, severance payments, and other compensation obtained by Individual Defendants, and each of them, in connection with, from or at the time of their wrongful conduct and fiduciary breaches.

190.    Plaintiff, on behalf of Uniti, has no adequate remedy at law.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Finding that the Uniti Board's inaction and indefinite deferral of Plaintiff's Demand was a *de facto* wrongful refusal;

B.    Finding that Defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and the Company has a right of contribution;

C.      Directing Uniti to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Company's accounting and disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and the public;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting and other internal controls;

- a proposal to declassify the Board;

- a proposal to require an independent Chair of the Board and separation of the roles of Chair of the Board and CEO;

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

- a provision to permit the stockholders of Uniti to nominate three candidates for election to the Board.

D.      Against each Defendant in favor of Uniti for damages sustained by Uniti, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

E. Requiring Defendants to return to Uniti all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

F. Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Uniti's directors, officers, and employees do not engage in wrongful or illegal practices;

G. Granting additional appropriate equitable and/or injunctive relief to remedy Defendants' misconduct, as permitted by law;

H. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

I. Granting such other and further relief as this Court deems just and equitable.

## XII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all issues so triable.

Dated:  February 11, 2022    **BROWN GOLDSTEIN & LEVY, LLP**

        By: */s/ Dana Whitehead McKee*
          DANA WHITEHEAD MCKEE
          Federal Bar No. 04447
          JOSEPH B. ESPO
          Federal Bar No. 07490
          120 E. Baltimore Street, Suite 2500
          Baltimore, MD  21202
          Telephone: (410) 962-1030
          Facsimile: (410) 385-0869
          dwm@browngold.com
          jbe@browngold.com

          *Local Counsel for Plaintiff*

**JOHNSON FISTEL, LLP**

MICHAEL I. FISTEL, JR.
*(pro hac vice to be filed)*
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
michaelf@johnsonfistel.com

*Attorney for Plaintiff*